UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
WARREN PEARL CONSTRUCTION                    :
CORPORATION et al.,
                                              :
                      Plaintiffs,             08 Civ. 9445 (WHP)
                                              :
        -against-                             MEMORANDUM & ORDER
                                              :

GUARDIAN LIFE INSURANCE COMPANY  :
OF AMERICA,
                                              :
                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

>               Plaintiffs Warren Pearl Construction Corporation ("WPC"), Warren Pearl, Susan
>
> Pearl, and Warren Pearl and Susan Pearl as next friend of Ian Pearl (collectively "Plaintiffs"),
>
> bring this action pursuant to the Employee Retirement Income Security Act of 1974, as amended,
>
> 29 U.S.C. § 1001, et seq. ("ERISA"), against Defendant Guardian Life Insurance Company of
>
> America ("Guardian") seeking to prevent Guardian from terminating coverage under a Guardian
>
> small group supplemental major medical insurance policy (the "WPC Policy"). On December 9,
>
> 2008, this Court denied Plaintiffs a preliminary injunction on their ERISA, HIPAA, and estoppel
>
> claims (the "December 2008 Memorandum & Order"). Defendant moves for summary judgment
>
> dismissing this action. For the following reasons, Defendant's motion is granted.

BACKGROUND

From December 1, 1981 to December 1, 2008, the WPC Policy insured the major medical expense portion of the employee welfare benefit plan (the "Plan") of Swim Construction Company, its successor, Courbette Construction, and its successor, WPC. (Plaintiff's Local Rule 56.1 Counterstatement of Material Facts dated June 24, 2009 ("Pl. Counterstatement") ¶ 1.) The Certificate of Coverage outlines the Plan's insurance benefits. It provides that "coverage ends . . . on the date [eligible employees] stop being a member of a class of employees eligible for insurance under this plan, or when this plan ends for all employees." (Declaration of John W. Fried dated June 24, 2009 ("Fried Decl.") Ex. 12: Certificate of Coverage at WPC-0457.) (emphasis in original). It also defines "Plan" as "the Guardian plan of group insurance purchased by your employer." (Certificate of Coverage at WPC-0444.) (emphasis in original).

The WPC Policy covered Warren Pearl, his wife Susan Pearl, and their son Ian Pearl. (Pl. Counterstatement ¶ 4.) Ian Pearl suffers from Type II Spinal Muscular Atrophy, a form of muscular dystrophy. (Pl. Counterstatement ¶ 5.) In 1991, Ian Pearl suffered full respiratory arrest that left him entirely ventilator-dependent. (Pl. Counterstatement ¶ 6.) As a result, Ian Pearl receives 24-hour nursing care in his parents' home in Florida. (Pl. Counterstatement ¶ 6.) The WPC Policy has provided WPC employees and their dependents with nursing and home health care benefits without any lifetime or annual benefit limitations. (Pl. Counterstatement ¶ 7.)

The WPC Policy, designated form "R0," was the first medical contract sold by Guardian in New York. (Pl. Counterstatement ¶ 2.) As of August 1, 1987, Guardian stopped selling health insurance policies designated "R0" to new policyholders in the New York small

2

group market,[1] but continued to renew extant "R0" policies like WPC's. (Pl. Counterstatement ¶¶ 11-12.) Guardian's second medical contract was designated "R1." Guardian also ceased offering that newer "R1" policy to new policyholders in New York as of August 1, 1987, but continued to renew "R1" form policies for existing policyholders. (Fried Decl. Ex. 9: E-mail from Ariel Fernando to Deborah Connolly dated June 8, 2007 ("Fernando E-mail") at GLIC08083.) In May 1992, Guardian discontinued marketing its third small group policy form known as "R2," but continued to renew "R2" form policies for existing policyholder groups. (Fernando E-mail at GLIC08083.) Since 1992, Guardian's "R3" policy form is the only policy it markets to prospective policyholder groups. (Fernando E-mail at GLIC08083.) While the "R1" and "R2" policy forms offer some private duty nursing coverage, the "R3" policy form does not. (Pl. Counterstatement ¶ 76.)

          In 2006, Guardian commenced an initiative referred to as "Moving Forward," which was designed to increase Guardian's competitive position by reducing what it paid out in claims. (Pl. Counterstatement ¶ 29.) As part of its "Risk Management Initiative," Guardian sought to eliminate products or groups of products with high claims experience. (Deposition transcript of Ariel Fernando dated Feb. 20, 2009 ("Fernando Dep. Tr.") at 17.) "Moving Forward" also included the "Discontinuation Project," an evaluation of medical insurance products and health insurance policies to determine whether they should be discontinued to achieve the corporate goals of "Moving Forward." (Pl. Counterstatement ¶ 31.) The "Discontinuation Project" involved a state-by-state examination of premiums, claims, and loss ratios of Guardian's older medical policies—the "R0," "R1," and "R2" forms, among others. (Pl. Counterstatement ¶ 36.) The loss ratio is the ratio of incurred claims to earned premiums.

---

[1] The small group market consists of employers with between 2 and 50 employees.

(Pl. Counterstatement ¶ 37.)

In November 2006, Guardian began studying its older policy forms in those states where Guardian's loss ratios were high. (Pl. Counterstatement ¶ 41.) Guardian examined specific plans and groups by claims experience. (Pl. Counterstatement ¶ 84.) That analysis identified incurred claims and loss ratios on a policy-by-policy basis. (Pl. Counterstatement ¶ 50.) Guardian considered such factors as to whether each policy's claims were based on an ongoing medical condition, which was likely to continue, or a terminal illness. (Pl. Counterstatement ¶ 55; Affidavit of Ariel Fernando dated June 10, 2009 ¶ 6.) The WPC Policy was identified as one with significant losses as part of that examination. (Pl. Counterstatement ¶ 58.) Guardian identified New York, New Jersey, and South Carolina as the states with the greatest losses. (Pl. Counterstatement ¶ 49.) Guardian determined that 29.9% of all medical claims paid in New York under the "R0" policy were for private duty nursing. In New Jersey, 53.3% of all medical claims paid under the "R0" policy were for private duty nursing. (Pl. Counterstatement ¶ 69.)

In January 2007, Guardian decided to discontinue the older policy forms in New York, New Jersey, and South Carolina because policyholders in those states were generating the highest claims. (Pl. Counterstatement ¶ 79.) Subsequently, Guardian also decided to discontinue those policies in Colorado. (Pl. Counterstatement ¶ 80.)

By letter dated July 2, 2007, Guardian alerted the New York State Insurance Department ("DOI") that it would discontinue all "R0" policies offered to small groups and "offer [them] the option to purchase one of our actively marketed plans under our R3 contract." (Fried Decl. Ex. 46: Guardian notice of intent of policy discontinuance to DOI dated July 2, 2007 ("Discontinuation Letter") at 1.) Guardian cited three "Reasons for Discontinuance": (1)

4

"[t]hese plans were written under our oldest generation of contract under which the language is

vague and obsolete"; (2) "these plans are complex to administer and we hope this discontinuation

will reduce the amount of complexity in administering similar plans"; and (3) "the very high loss

ratios we've experienced over the last two years." (Discontinuation Letter at 2-3.)  In the

Discontinuation Letter, Guardian also informed DOI that it "will offer these small employers

affected by the discontinuation the option to purchase all other hospital, surgical and medical

expense coverage currently being offered," and that "[a]ll new plans sold since 1992 has [sic]

been under the R3 contract." (Discontinuation Letter at 1.)  At the time, Guardian had

approximately 54 "R0" policyholders in New York, including WPC. (Plaintiffs' Local Rule 56.1

Statement ¶ 3.)  On September 13, 2007, DOI informed Guardian that "[t]he letters and

supporting material regarding your company's product discontinuance are now acceptable."

(Affidavit of Paul K. Stecker dated July 2, 2009 Ex. A at 330: E-mail from Stephen Rings to

Ariel Fernando.)

On August 20, 2008, Guardian advised WPC that it was discontinuing the WPC

Policy effective December 1, 2008 because it was withdrawing "R0" policies from the market.

(Pl. Counterstatement ¶ 29.)  Guardian did not inform WPC that it could opt to replace the WPC

Policy with either the "R1" or "R2" form policies. (Pl. Counterstatement ¶ 103.)  With respect to

Ian Pearl, Guardian agreed to a year-long extension of benefits provided for disabled dependents

under the WPC Policy, which is scheduled to end on December 1, 2009. (Pl. Counterstatement ¶

122.)

By letter dated August 25, 2008, WPC lodged its objection to Guardian's

discontinuation of the WPC Policy with DOI. (Pl. Counterstatement ¶ 114.)  In September 2008,

DOI responded, concluding that it "found no evidence that [Guardian] violated New York State

5

Insurance Laws or Regulations." (Fried Decl. Ex. 56: DOI response to WPC complaint dated

September 19, 2008.)  DOI's State Health Bureau representative testified:

> I believe we have read [N.Y. Ins. Law § 3221(p)] . . . to mean that so long as all
> insureds covered by the plan are being treated in the same manner as opposed to
> being selectively treated so that some insureds would not be terminated and other
> insureds would be, that that not being the case here, we would not have proceeded
> to look into that matter under our reading of our authority in the statute.

(Deposition transcript of Stephen Rings dated Jan. 23, 2009 at 38-39.)


## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d

Cir. 2007).  The burden of demonstrating the absence of any genuine dispute as to a material fact

rests with the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  In

determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty

Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).


### II.  HIPAA

Plaintiffs allege that Guardian violated the Health Insurance Portability and

Accountability Act ("HIPAA") and its state law counterpart by terminating the WPC Policy

based on Ian Pearl's adverse claims experience.

HIPAA provides that "if a health insurance issuer offers health insurance coverage in the small or large group market in connection with a group health plan, the issuer must renew or continue in force such coverage at the option of the sponsor of the plan." 42 U.S.C. § 300gg-12(a).  One exception permits an insurer to terminate a particular type of coverage in the small group market where "the issuer acts uniformly without regard to the claims experience of those sponsors or any health status-related factor relating to any participants or beneficiaries covered . . . ."  42 U.S.C. § 300gg-12(c)(1)(C).  HIPAA provides that only the Secretary of Health and Human Services or other authorized state authorities may bring a HIPAA enforcement action.  See 42 U.S.C. § 300gg-22.

"Without a showing of congressional intent, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007). As a result, courts have held that HIPAA does not provide for either an express or implied private right of action. See Acara v. Banks, 470 F.3d 569, 571 (5th Cir. 2006) ("[W]e are not alone in our conclusion that Congress did not intend for private enforcement of HIPAA."); Webb v. Smart Document Solutions, LLC, 499 F.3d 1078, 1081 (9th Cir. 2007) ("HIPAA itself provides no private right of action."); accord Runkle v. Gonzales, 391 F. Supp. 2d 210, 237 (D.D.C. 2005); Valentin Munoz v. Island Finance Corp., 364 F. Supp. 2d 131, 136 (D. Puerto Rico 2005); O'Donnell v. Blue Cross Blue Shield of Wyo., 173 F. Supp. 2d 1176, 1180 (D. Wyo. 2001); Royce v. Veteran Affairs Regional Office, No. 08 Civ. 01993 (KMT)(KLM), 2009 WL 1904332, at *6 (D. Colo. July 1, 2009); Hines v. N. W.Va. Operations, No. 08 Civ. 144 (FPS), 2009 WL 1228305, at *3 (N.D. W.Va. May 1, 2009).  Accordingly, Defendant's motion

7

for summary judgment dismissing Plaintiffs' HIPAA claim is granted.[2]

III. ERISA

    A. Discrimination

        Section § 1182(a)(1) of ERISA provides, "Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on . . . [h]ealth status [and, or] . . . [c]laims experience." 29 U.S.C. § 1182(a)(1). Subsection (2) provides that (a)(1) shall not be construed "to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage." 29 U.S.C. § 1182(a)(2). Section 1182 "may be enforced by an ERISA participant's claim 'to enjoin any act or practice which violates any provision of this subchapter.'" Werdehausen v. Benicorp Ins. Co., 487 F.3d 660, 668 (8th Cir. 2007) (quoting 29 U.S.C. § 1132(a)); see also Stang v. Clifton Gunderson Health Care Plan, 71 F. Supp. 2d 926, 933 (W.D. Wis. 1999) (permitting plaintiff to bring an action under § 1182 based on the private right of action available under § 1132(a)).

        No court has addressed the meaning of the phrase "establish rules for eligibility." Thus, the question—whether Guardian's decision to withdraw the "R0" form policy from the New York small group market "establish[ed] rules for eligibility" within the meaning of 29

---

[2] Plaintiffs also invoke a nearly identical provision of state insurance law as part of its claim that Defendant violated HIPAA. See N.Y. Ins. Law § 3221(p)(3)(A). Since § 3221(p)(3)(A)(iii) reflects the state's efforts to comply with HIPAA, see 42 U.S.C. § 300gg-22(a)(1), but similarly contains no private right of action, Plaintiffs' state law claim is also dismissed.

U.S.C. § 1182(a)(1)—is an issue of first impression.

Construction of a statute begins with the words of the text. Mallard v. United States Dist. Court, 490 U.S. 296, 300 (1989); Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 101 (2d Cir. 2004) (quoting Saks v. Franklin Covey Co., 316 F.3d 337, 345 (2d Cir. 2003)). "Statutory construction . . . is a holistic endeavor." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., 484 U.S. 365, 371 (1988). "The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another." Knox v. Agria Corp., 613 F. Supp. 2d 419, 421-22 (S.D.N.Y. 2009) (quoting Auburn Housing Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002)). The "cardinal rule [is] that a statute is to be read as a whole, . . . since the meaning of statutory language, plain or not depends on context." King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991). It is also a "'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" Henrietta D. v. Bloomberg, 331 F.3d 261, 279 (2d Cir. 2003) (quoting Tcherepnin v. Knight, 389 U.S. 332, 336 (1967)).

The phrase "establish rules for eligibility" does not appear on its face to address an insurer's decision to withdraw a policy form from the market. The regulations promulgated under HIPAA interpreting the phrase provide examples of rules for eligibility that violate the statute. See 29 C.F.R. § 2590.702(b)(1)(iii); see also Ames v. Group Health Inc., 553 F. Supp. 2d 187, 193 (E.D.N.Y. 2008) (turning to the HIPAA regulations to determine whether Defendant's rules for eligibility violated § 1182(a)). In one example in the regulations, an employer sponsors a group health plan available to all employees who enroll within the first 30 days of employment, but those who enroll later are required to pass a physical examination. The HIPAA regulations instruct that "the requirement to pass a physical examination in order to

9

enroll in the plan is a rule for eligibility that discriminates based on one or more health factors . . . ." 29 C.F.R. § 2590.702(b)(1)(iii). In another example, an employer's group health plan permits employees who enroll during the first 30 days of employment to choose between two benefit packages, while those who enroll later are offered only one option conditioned on their good health. Again, the regulations instruct that "the requirement to provide evidence of good health in order to be eligible for late enrollment . . . is a rule for eligibility that discriminates based on one or more health factors . . . ." 29 C.F.R. § 2590.702(b)(1)(iii). Two other examples in the HIPAA regulations describe similar scenarios.

The examples in the HIPAA regulations suggest that a "rule for eligibility" presupposes the existence of a policy and attendant coverage. In such circumstances, the statute prohibits insurers from establishing eligibility criteria based on health status or claims experience. However, rules for eligibility lose their raison d'être when an insurer withdraws its policy from the market because eligibility determinations no longer need to be made. It would be counterintuitive to establish eligibility rules for a policy that no longer exists.

Second, interpreting "establish rules for eligibility" to apply to Guardian's decision to withdraw the "R0" policy from the market is at odds with the statute as a whole. Subsection (a)(2) provides that (a)(1) shall not be construed "to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage." 29 U.S.C. § 1182(a)(2)(A). Guardian is no longer providing any benefits under the "R0" policy, other than the one-year extension for disabled dependents. Thus, construing the phrase "establish rules for eligibility" as operating to prohibit withdrawal of the "R0" policy from the market would require Guardian to provide benefits it no longer offers.

10

Finally, the statute's legislative history buttresses the conclusion that Guardian's

decision to withdraw the "R0" policy from the New York small group market did not "establish

rules for eligibility." In enacting § 1182, Congress noted:

> It is the intent of the conferees that a plan or coverage cannot single out an
> individual based on the health status or health status related factors of that
> individual for denial of a benefit otherwise provided other individuals covered
> under the plan or coverage. For example, the plan or coverage may not deny
> coverage for prescription drugs to a particular beneficiary or dependent if such
> coverage is available to other similarly situated individual [sic] covered under the
> plan or coverage. However, the plan or coverage could deny coverage for
> prescription drugs to all beneficiaries and dependents. The term "similarly
> situated" means that a plan or coverage would be permitted to vary benefits
> available to different groups of employees, such as . . . employees in different
> geographic locations.

H.R. Conf. Rep. No. 104-736, at 187 (1996). This legislative history suggests that Congress was

concerned with the disparate treatment of individuals

Plaintiffs point to C.F.R. § 2590.702(b)(1)(ii)(H) which provides that, "rules for

eligibility include . . . rules relating to . . . [t]erminating coverage (including disenrollment) of

any individual under the plan." However, consistent with 29 U.S.C. § 1182(a)(1), and its

legislative history, the regulation specifically refers to terminating an individual's coverage, not

an entire policy. Here, Guardian terminated all 54 employer groups in New York with plans

covered by the "R0" policy.

Accordingly, Guardian's decision to withdraw the "R0" policy from the New

York small group market did not "establish rules for eligibility" within the meaning of 29 U.S.C.

§ 1182(a)(1). Defendant's motion for summary judgment dismissing Plaintiffs' ERISA

discrimination claim is granted.

B. Disclosure Obligations

ERISA provides that "[t]he administrator [of any employee benefit plan] shall

11

furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description [("SPD")] . . . ." 29 U.S.C. § 1024(b). The SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). It shall set forth, inter alia, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). "ERISA contemplates that the [SPD] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." Layaou v. Xerox Corp., 238 F.3d 205, 209 (2d Cir. 2001) (internal quotation marks and citation omitted).

      The administrator is defined as "the person specifically so designated by the terms of the instrument under which the plan is operated" or, "if an administrator is not so designated, the plan sponsor." 29 U.S.C. §§ 1002(16)(A), (B). "Plan sponsor" is defined as "the employer in the case of an employee benefit plan established or maintained by a single employer." 29 U.S.C. § 1002(16)(B). To establish liability under 29 U.S.C. § 1132(a)(1)(B) for failure to provide an adequate SPD, Plaintiffs must demonstrate that Guardian was designated the plan administrator. See Lee v. Burkhart, 991 F.2d 1004, 1010 (2d Cir. 1993) (obligation to furnish each participant with an SPD "is placed on the person designated under ERISA as the 'administrator' of the plan, not every fiduciary."); Krauss v. Oxford Health Plans, Inc., 418 F. Supp. 2d 416, 434 (S.D.N.Y. 2005) ("Absent a specific declaration in Plan documents that an insurance company is the administrator, this Court cannot infer [administrator] status."), aff'd, 517 F.3d 614 (2d Cir. 2008); see also Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 62 (4th Cir. 1992) ("While it is true that an insurer will usually have administrative responsibilities with

12

respect to the review of claims under the policy, that does not give this court license to ignore the statute's definition of plan administrator and to impose on [the insurer] the plan administrator's notification duties.").

Plaintiffs cannot point to any document designating Guardian as the plan administrator. Rather, relying on cases outside this circuit, Plaintiffs argue that Guardian may be treated as the de facto administrator because it controls all aspects of plan administration. However, the Second Circuit has rejected the holding by sister circuits "that under certain circumstances a party not designated as an administrator may be liable for failing to furnish a plan description." See Lee, 991 F.2d at 1010 n.5; Law v. Ernst & Young, 956 F.2d 364, 372 (1st Cir. 1992).

Plaintiffs' attempt to distinguish Lee is unavailing. While Lee involved a self-funded plan and an insurer's narrow responsibilities regarding claims administration, the Second Circuit's reasoning did not turn on those characteristics. See also Schnur v. CTC Comm'cns Corp. Group Disability Plan, --- F. Supp. 2d ---, 2008 WL 4615907, at *13 (S.D.N.Y. Oct. 10, 2008) (internal citations omitted). Rather, the Court of Appeals focused on the language of the statute, which defines an administrator as "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. §§ 1002(16)(A) (emphasis added); Lee, 991 F.2d at 1010 n.5; see also Schnur, 2008 WL 4615907, at *13. Accordingly, because Guardian was not specifically designated as the administrator, it may not be held liable for inadequate disclosures under 29 U.S.C. § 1132(a)(1)(B).

Nevertheless, to the extent Plaintiffs seek equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), their claims remain viable. See Crocco v. Xerox Corp., 137 F.3d 105, 107 n.2 (2d Cir. 1998) (distinguishing between actions to recover benefits under §

13

502(a)(1)(B), which can be brought only against a plan or plan administrator, and claims for injunctive or other equitable relief under § 502(a)(3)). A plaintiff may pursue an equitable claim against a de facto administrator that failed to provide adequate disclosures.[3] See Amara v. Cigna Corp., 534 F. Supp. 2d 288, 333-34 (D. Conn. 2008); see also Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150, 181 (D. Conn. 2006), overruled on other grounds by Hirt v. Equitable Ret. Plan for Employees, Managers, & Agents, 533 F.3d 102, 104 (2d Cir. 2008).

   The parties disagree over whether the Certificate of Coverage constituted an SPD. Assuming the Certificate of Coverage is an SPD, it adequately sets forth "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). "Section 1022(b) relates to an individual employee's eligibility under then existing, current terms of the Plan and not to the possibility that those terms might later be changed, as ERISA undeniably permits." Wise v. El Paso Natural Gas Co., 986 F.2d 929, 935 (5th Cir. 1993); Gable v. Sweetheart Cup Co., 35 F.3d 851, 858 (4th Cir. 1994). Under the section titled "When Your Coverage Ends," the Certificate of Coverage clearly states, "Your coverage ends . . . when this plan ends for all employees. And it ends when this plan is changed so that benefits for the class of employees to which you belong ends." That provision is repeated several times throughout the Certificate of Coverage. "Plan" is defined on the first page of the Certificate to mean "the Guardian plan of group insurance purchased by your employer." Thus, the Certificate of Coverage sufficiently informed Plaintiffs that coverage would end when Guardian's WPC Policy no longer funded the Plan.

   Plaintiffs argue that Guardian did not provide Plaintiffs with any document

---

[3] Because this Court finds the purported SPD sufficient, it does not address whether Guardian should be treated as the de facto plan administrator.

disclosing Guardian's ability to terminate the WPC Policy as opposed to the Plan. "A company may establish an employee welfare benefit plan merely by purchasing a group policy for its employees, and the plan may consist of nothing but the purchased policy document." Gable, 35 F.3d at 856. As a result, the reservation of the right to modify the Plan is equivalent to a reservation of the right to modify the WPC Policy. Cf. Gable, 35 F.3d at 856 (reservation of right to modify the policy was tantamount to a reservation of rights to modify plan benefits generally, where the "master policy constituted the entirety of the company's welfare benefit plan"). That is exactly the situation here—the Plan operates entirely through the WPC Policy.

Accordingly, Defendant's motion for summary judgment dismissing Plaintiffs' SPD claim is granted.

C. Breach of Fiduciary Duty

An ERISA fiduciary must discharge its duties with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B); Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 87 (2d Cir. 2001). The fiduciary should act "solely in the interest of the participants and beneficiaries," and its overarching purpose should be to "provid[e] benefits to the participants and their beneficiaries" and to "defray[ ] reasonable expenses of administering the plan." Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998) (alterations in original); see also 29 U.S.C. § 1104(a)(1).

N.Y. Ins. Law § 3221(p)(3)(A)(ii) provides that where an issuer decides to discontinue a particular type of group health insurance coverage, the issuer must offer to each policyholder "the option to purchase all . . . other hospital, surgical and medical expense coverage currently being offered by the insurer." (emphasis added). Plaintiffs argue that

15

Guardian breached its fiduciary duty by failing to disclose the availability of, and to offer, its "R1" and "R2" form policies as options for replacement of the discontinued "R0" form coverage. Guardian argues that policies "currently being offered" do not include the "R1" and "R2" form policies because they were only available on a renewal basis to existing "R1" and "R2" policyholder groups.

Construction of the phrase "currently being offered" is an issue of first impression under New York law that affects the outcome of this case.[4] N.Y. Ins. Law § 3231(a) governs the manner in which insurers conduct business in New York and provides that "any small group . . . applying for individual health insurance coverage . . . must be accepted at all times throughout the year for any hospital and/or medical coverage <u>offered by the insurer</u> to individuals or small groups in this state." (emphasis added). The implementing regulations allow insurers to continue a policy form in accordance with the statute's community rating requirements, or to withdraw it from the New York market. First United Am. Life Ins. Co. v. Curiale, 613 N.Y.S.2d 494, 495 (3d Dep't 1994) ("[I]f [an insurer] feels that it cannot generate acceptable revenue under the new rate mechanism or for any reason is unwilling to accept community rating, it is entitled to withdraw from the New York market by ceasing to issue new policies."); see also Coan v. State Farm Mut. Auto. Ins. Co., 911 F. Supp. 81, 85 (E.D.N.Y. 1996). Section 3231(a) provides that "once accepted for coverage . . . [t]ermination of an individual or small group shall be based only on one or more of the reasons set forth in [§ 3221(p)]." N.Y. Ins. Law § 3231(a).

---

[4] This may present an appropriate opportunity for certification to the New York Court of Appeals. See Runner v. N.Y. Stock Exch., Inc., 568 F.3d 383, 388-89 (2d Cir. 2009) ("Where authorized by state law, this Court may certify to the highest court of a state an unsettled and significant question of state law that will control the outcome of a case pending before this Court.") (citation omitted); Regatos v. North Fork Bank, 396 F.3d 493, 498 (2d Cir. 2005) (certifying an unsettled and significant issue of state law that will control the outcome of the case).

16

Section 3221(p)(3)(A)(ii), the statute at issue in this case, provides that where an issuer decides to discontinue a particular type of group health insurance coverage, the issuer must offer to each policyholder "the option to purchase all . . . other hospital, surgical and medical expense coverage <u>currently being offered by the insurer</u>." (emphasis added).  Thus, section 3221(p)(3)(A)(ii) governs withdrawal from the New York market.  Accordingly, the term "offered by the insurer" should be interpreted consistently.  <u>See</u> <u>Puello v. Bureau of Citizenship and Immigration Servs.</u>, 511 F.3d 324, 329 (2d Cir. 2007) ("[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (quoting <u>Auburn Hous. Auth. v. Martinez</u>, 277 F.3d 138, 144 (2d Cir. 2002)); <u>Schneider v. Feinberg</u>, 345 F.3d 135, 146 (2d Cir. 2003) ("The canons of statutory construction favor the consistent use of terms throughout a statute.").

DOI regulations under § 3231(a) were "designed to protect insurers writing policies from claim fluctuations and unexpected significant shifts in the number of persons insured." <u>Colonial Life Ins. Co. of Am. v. Curiale</u>, 617 N.Y.S.2d 377, 379 (3d Dep't 1994). Those regulations provide that "the department believes that insurers should be permitted to continue to serve certain previously issued policies without having to accept new applicants for older policies on an open enrollment basis," and "an insurer may continue to renew the policies without accepting any new applicants for such policies." 11 N.Y. Comp. Codes R. & Regs. tit. 11, § 360.4(a),(f)(1)-(2); <u>see also</u> <u>Council of the City of N.Y. v. Pub. Serv. Comm'n of State of N.Y.</u>, 99 N.Y.2d 64, 74, (2002) ("[T]he interpretation given to a regulation by the agency which promulgated it and is responsible for its administration is entitled to deference if that interpretation is not irrational or unreasonable.") (citation and internal quotation marks omitted).

DOI's interpretation of the term "offered by the insurer" is reasonable.  It permits

17

an insurer to "continue to renew [its] policies without accepting any new applicants for such policies." DOI's regulation harmonizes with § 3221(p)(3)(A)(ii), which requires insurers to present the option to purchase coverage currently being offered—recognizing that some coverage options may no longer be offered to new applicants. This reading is supported by DOI's acceptance of Guardian's proposal to discontinue plans under the "R0" contract and offer small groups the option to purchase plans under the "R3" form, the only contract Guardian actively marketed in New York. It also recognizes that sponsors of welfare benefit plans are accorded "flexibility to make future modifications of such plans as inflation, changes in medical practice and technology, and the costs of treatment dictate." Grable, 35 F.3d at 859 (citation and internal quotation marks omitted).

Because this Court concludes that the "R1" and "R2" policies were not "currently being offered" within the meaning of N.Y. Ins. Law § 3221(p)(3)(A)(ii), Guardian was not obliged to offer WPC its "R1" and "R2" form policies as replacement options. Accordingly, Guardian's motion for summary judgment dismissing Plaintiff's ERISA breach of fiduciary duty claim is granted.

D. Attorney's Fees

"In any action under [ERISA], . . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g). "Although success on the merits is not, in theory, indispensable to an award of attorneys' fees under 29 U.S.C. § 1132(g)(1), rarely will a losing party . . . be entitled to fees." Krauss, 418 F. Supp. 2d at 435 (quoting Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Employee Pension Ben. Plan, 698 F.2d 593, 602 (2d Cir. 1983)) (alterations in original).

Since Plaintiffs have not prevailed on their claims and neither side has exhibited

18

bad faith or culpability, this Court declines to award fees.[5]

## IV. Remaining Claims

Plaintiffs also assert claims for promissory and equitable estoppel, breach of contract, and unconstitutional impairment of contract rights. Plaintiffs did not respond to Defendant's summary judgment motion seeking dismissal of these claims. Accordingly, they are deemed abandoned and Plaintiff's estoppel and contract claims are dismissed. See Babcock v. N.Y. State Office of Mental Health, No. 04 Civ. 2261 (PGG), 2009 WL 1598796, at *1 n.3 (S.D.N.Y. June 8, 2009) (citations omitted).

---

[5] Some courts have held that a request for fees under ERISA is not a separate cause of action. See Cerasoli v. Xomed, Inc., 972 F.Supp. 175, 183 (W.D.N.Y. 1997). In any event, since Defendants move for summary judgment dismissing Plaintiffs' complaint in its entirety, Plaintiffs' separate cause of action seeking attorneys' fees and costs is also dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment dismissing Plaintiffs' claims in their entirety is granted. The Clerk of the Court is directed to terminate all motions pending and mark this case closed.

Dated:     July 22, 2009
           New York, New York

                                   SO ORDERED:

                                   _____
                                   WILLIAM H. PAULEY III
                                   U.S.D.J.

*Counsel of record:*

John Walter Fried, Esq.
Fried and Epstein
350 Fifth Avenue
Suite 7612
New York, NY 10118
*Counsel for Plaintiffs*

Paul Kenneth Stecker, Esq.
Phillips Lytle LLP (Madison Ave.)
437 Madison Avenue
New York, NY 10022
*Counsel for Defendant*